IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **UNDER SEAL** |
| | ) |
| v. | ) Criminal No. 1:19-CR-109 |
| | ) |
| ZALDY N. SABINO, | ) Count 1: 18 U.S.C. § 371 (Conspiracy) |
| | ) |
| Defendant. | ) Count 2: 18 U.S.C. § 201(b)(2) (Bribery) |
| | ) |
| | ) Counts 3-14: 18 U.S.C. §§ 1343 and 1346 |
| | ) (Honest Services Wire Fraud) |
| | ) |
| | ) Counts 15-17: 18 U.S.C. §§ 1001(a)(2) and 2 ) |
| | (False Statements) |
| | ) |
| | ) Forfeiture Notice |

**INDICTMENT**

April, 2019 Term – at Alexandria

THE GRAND JURY CHARGES THAT:

**GENERAL ALLEGATIONS**

At times material to this Indictment:

1.     The United States Department of State ("DOS") was a department within the Executive Branch of the United States government.

2.     The Office of Acquisitions Management ("AQM") was a component within the DOS that was responsible for the majority of the DOS's operational acquisitions. AQM's worldwide procurement services included acquisition planning, contract negotiations, cost and price analysis, and contract administration. AQM was located in Arlington, Virginia, in the Eastern District of Virginia.

3. Defendant ZALDY N. SABINO was employed by the DOS beginning in or about November 2004. SABINO served as a contract specialist with AQM, and he was also a contracting officer who was authorized to execute certain contracts on behalf of the DOS. SABINO worked in AQM's Facilities Design Construction Division ("FDCD") in Arlington, Virginia. FDCD supported and administered contracts involving the DOS's Bureau of Overseas Buildings Operations ("OBO"). OBO frequently awarded contracts to international construction companies seeking to do business and perform design-build contracts at U.S. embassies and consular buildings.

4. PERSON A was a Turkish national and the owner of COMPANY A, an international construction firm based in Turkey. PERSON A and COMPANY A did business with the DOS's OBO on overseas construction projects, primarily as a subcontractor to, and business partner with, construction firms based in the United States. SABINO supervised some of these contracts.

5. Company B was an international construction firm based in Maryland. Between in or about 2011 and at least in or about 2016, Company B entered into business agreements with PERSON A and COMPANY A.

6. Company C was an international construction firm based in Maryland. Between in or about 2013 and at least in or about 2016, Company C entered into business agreements with PERSON A and COMPANY A.

7. Company D was an international construction firm based in Turkey. PERSON A served as an informal consultant and intermediary for Company D in connection with DOS contracts in Yemen.

8.    On or about the dates listed below, the DOS awarded the following contract and task orders to COMPANY A and its respective business partners:

| DOS Contract No. | Awardee/ Partners | Award Date & Amount | Description | Completion Date & Amount |
|---|---|---|---|---|
| SAQMMA-12-C-0283 | B & A | 09/28/2012 $84,419,375 | Power plant replacement and utility infrastructure upgrades, U.S. Embassy, Baghdad, Iraq | On-going $142,081,348 |
| SAQMMA-13-F-2084 Task order under IDIQ SAQMMA-08-D-0019 | C, B, & A | 07/10/2013 $4,895,675 | Installation of Temporary HATS, U.S. Consulate, Adana, Turkey | 11/20/2014 $8,017,638 |
| SAQMMA-13-F-3888 Task order under IDIQ SAQMMA-08-D-0019 | C, B, & A | 09/27/2013 $3,834,534 | Construction of campus pavilion and admin. facilities, U.S. Consulate, Ankara, Turkey | 08/04/2016 $4,061,803 |
| SAQMMA-16-F-0914 Task order under IDIQ SAQMMA-14-D-0063 | B & A | 02/23/2016 $2,904,976 | Design-build, Villa Renovations, Marine Security Guard Residence, U.S. Consulate, Erbil, Iraq | 03/30/2017 $4,480,424 |
| SAQMMA-16-F-0266 Task order under IDIQ SAQMMA-14-D-0063 | B & A | 08/05/2016 $4,885,950 | Design-build, Marine Security Guard Residence, U.S. Consulate, Basrah, Iraq | 05/25/2017 $365,000 (T4C pending) |

9.    Between in or about November 2012 and in or about September 2015, PERSON A and associates made wire transfers from foreign bank accounts associated with, or maintained by, PERSON A, COMPANY A, and other business partners, to two Bank of America ("BOA") accounts maintained by PERSON A at a BOA branch located in the lobby of a DOS building near SABINO's office building in Arlington, Virginia. PERSON A opened the first BOA account on or about April 21, 2006, and the second BOA account on or about November 13, 2012. PERSON A, who was the only signatory and authorized user on both BOA accounts, closed these accounts on or about September 29, 2015.

## COUNT 1
### (Conspiracy)

10.     The allegations set forth in paragraphs 1-9 are realleged and incorporated by reference as though fully set forth herein.

11.     Beginning no later than in or about November 2012, and continuing thereafter until at least in or about early 2017, in the Eastern District of Virginia and elsewhere, the defendant, ZALDY N. SABINO, PERSON A, and others known and unknown, did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other:

      a.     To engage in bribery, that is to,

         i.     directly and indirectly, knowingly and corruptly give, offer, and promise anything of value to a public official and to any other person and entity, with intent to influence an official act, in violation of 18 U.S.C. § 201(b)(1); and

         ii.     being a public official, directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of an official act, in violation of 18 U.S.C. § 201(b)(2); and

      b.     To devise and intend to devise a scheme and artifice to defraud and deprive the DOS and the citizens of the United States of their intangible right to the honest services of SABINO, a DOS contract specialist and contracting officer, through bribery, and to cause wire communications to be transmitted in interstate and foreign commerce for the purpose of executing such scheme, in violation of 18 U.S.C. §§ 1343 and 1346.

### Purpose of the Conspiracy

12.     The purpose of the conspiracy was:  (a) to use SABINO's official position as a DOS contract specialist and contracting officer to benefit and enrich SABINO, PERSON A, and

COMPANY A through bribery; (b) to defraud the DOS and the citizens of the United States and deprive them of their intangible right to the honest services of SABINO, a DOS contracting officer and contract specialist; and (c) to conceal the nature and purpose of the scheme and artifice to defraud.

### Manner and Means of the Conspiracy

The conspiracy was carried out through the following manner and means, among others:

13.    Between in or about November 2012 and in or about December 2016, PERSON A offered and gave, and SABINO solicited and accepted from PERSON A, things of value, including cash payments, in exchange for official actions in the awarding, modifying, administering, and supervising of contracts and task orders awarded to COMPANY A and its business partners. SABINO received the cash payments from PERSON A and by using an Automated Teller Machine ("ATM") debit card linked to PERSON A's second BOA account in the United States.

14.    Between in or about November 2012 and in or about December 2016, SABINO deposited cash into bank accounts maintained by SABINO and his wife, and SABINO paid cash towards his credit card and line of credit accounts (hereafter collectively referred to as "cash deposits"). The cash deposits totaled approximately $507,543.93.

15.    Between in or about November 2012 and in or about December 2013, SABINO received cash payments from PERSON A.  SABINO made approximately $99,258.89 in cash deposits during this period.

16.    Between in or about December 2013 and in or about July 2015, SABINO, using an ATM debit card linked to PERSON A's second BOA account, withdrew approximately $239,300 from the account through approximately 396 ATM transactions.  The majority of these

-5-

transactions occurred in the lobby of a DOS building near SABINO's office building in Arlington, Virginia and BOA branches located near SABINO's residence in Fort Washington, Maryland.

17.     Between in or about December 2013 and in or about July 2015, after funds in the second BOA account had been withdrawn and the account balance had been depleted, PERSON A replenished the second BOA account on a periodic basis by transferring money from the first BOA account and by making and causing others to make incoming wire transfers from foreign bank accounts to both BOA accounts.

18.     Between in or about mid or late 2015 and in or about December 2016, SABINO received cash payments from PERSON A.  SABINO made approximately $167,211 in cash deposits during this period.

19.     During the four-year period when SABINO was receiving cash payments from PERSON A, SABINO supervised, negotiated, administered, and made decisions and recommendations on DOS contracts and task orders awarded to COMPANY A and its business partners.  SABINO routinely communicated and met with PERSON A and representatives of COMPANY A and COMPANY A's business partners, and he signed, recommended, administered, authorized, and supervised numerous contract awards and contract modifications, which awarded millions of dollars to COMPANY A and its business partners.

### Overt Acts

In furtherance of the conspiracy and to effect its objects, SABINO, PERSON A, and others committed the following overt acts, among others, in the Eastern District of Virginia and elsewhere:

20.     On or about November 13, 2012, a few days after PERSON A had flown to the Eastern District of Virginia and stayed at a hotel in Arlington (and shortly after Company D's senior management had met with SABINO in Arlington to negotiate and resolve approximately $40 million in requests for equitable adjustments ("REAs") on the Yemen contract), PERSON A opened the second BOA account, and PERSON A also withdrew approximately $10,500 in cash from the first BOA account at a BOA branch located in the lobby of a DOS building near SABINO's office building.

21.     On or about November 14, 2012, SABINO made a $10,000 cash deposit.

22.     On or about January 23, 2013, after PERSON A had flown to the Eastern District of Virginia and stayed at a hotel in Arlington (on or about January 21-25, 2013), SABINO made a $15,000 cash deposit.

23.     On or about February 6, 2013, after SABINO had assumed responsibility for the Baghdad power plant contract, PERSON A forwarded two earlier e-mail chains about the project to SABINO's personal e-mail account.  PERSON A stated in one of the e-mails:  "Sir, This one is for info only . . . [COMPANY A] is my company and I am their consultant… :)."

24.     Between on or about March 23, 2013 and on or about April 23, 2013, SABINO and PERSON A repeatedly communicated with each other by telephone and text messages. During this period, PERSON A was attempting to develop new business for COMPANY A, and Company D and PERSON A were communicating frequently with SABINO about Company D's REA negotiations for the Yemen contract.

25.     On or about April 8, 2013, a few minutes after sending an e-mail and several attachments to Company D's senior management relating to the outstanding REAs, SABINO forwarded the same attachments to PERSON A.

26.     On or about April 24, 2013, SABINO included COMPANY A on a list of Turkish companies that were deemed qualified to perform a contract to supply and install temporary hardened alternative trailer systems ("HATS") at the U.S Consulate in Adana, Turkey.

27.     Between on or about May 14, 2013 and on or about May 17, 2013, after SABINO and PERSON A had communicated by telephone, SABINO met with representatives of COMPANY A and its business partners in Adana, Turkey in connection with the Adana HATS contract.

28.     On or about May 18, 2013, the day after returning from Turkey, SABINO made a $3,000 cash deposit.

29.     Between on or about May 27, 2013 and on or about June 3, 2013, SABINO traveled to Ankara, Turkey where, among other things, he met with PERSON A and he met with senior management at Company D to negotiate and resolve the REAs.

30.     On or about June 7, 2013, one day after meeting with PERSON A's joint venture partners in Arlington to discuss the Baghdad power plant contract, SABINO signed a DOS letter authorizing a limited notice to proceed with the project.

31.     Between on or about June 11, 2013 and on or about June 13, 2013, after PERSON A had flown to the Eastern District of Virginia and transferred approximately $120,000 to the first BOA account, PERSON A withdrew approximately $46,000 in cash through three counter withdrawals.

32.     Between on or about June 17, 2013 and on or about September 6, 2013, SABINO made approximately $41,100 in cash deposits.  During this period, PERSON A and COMPANY A's business partners were meeting and communicating with SABINO regarding the Baghdad

-8-

power plant project, the Adana HATS project, the Ankara campus pavilion project. SABINO

also met with Company D's representatives in Ankara to negotiate the outstanding REAs.

33.     On or about July 10, 2013, SABINO signed a contract awarding approximately

$4,895,675 to COMPANY A's business partner for the Adana HATS project.

34.     On or about September 29, 2013, a day after SABINO and PERSON A

communicated by telephone, SABINO signed a findings and determinations letter to award the

Ankara campus pavilion project to COMPANY A's business partner. The amount awarded was

approximately $3,834,544.

35.     Between on or about November 12, 2013 and on or about November 14, 2013,

after PERSON A had flown to the Eastern District of Virginia and approximately $40,000 was

transferred from COMPANY A's foreign bank account to the first BOA account, PERSON A

withdrew approximately $40,000 from the BOA account through six separate cash withdrawals.

36.     Between on or about November 13, 2013 and on or about December 13, 2013,

SABINO made five cash deposits totaling approximately $22,158.89.

37.     Between on or about November 17, 2013 and on or about November 23, 2013,

SABINO traveled to Istanbul, Adana, and Ankara, Turkey, where, among other things, he met

with PERSON A and COMPANY A's business partners in Ankara.

38.     On or about December 28, 2013, while PERSON A was outside the United States,

SABINO withdrew approximately $500 from PERSON A's second BOA account using an ATM

debit card at a BOA branch located near SABINO's residence in Maryland.

39.     On or about January 17, 2014, after PERSON A had flown to the Eastern District

of Virginia, PERSON A transferred approximately $15,000 from PERSON A's first BOA

account to the second BOA account.

40. Between on or about January 17, 2014 and on or about January 28, 2014, SABINO made cash deposits totaling approximately $12,850.

41. Between on or about January 24, 2014 and on or about April 11, 2014, while PERSON A was outside the United States, SABINO withdrew approximately $18,500 from PERSON A's second BOA account through a series of $500 ATM transactions at BOA branches, which, with one exception, were located near SABINO's residence in Maryland and in the lobby of a DOS building near SABINO's office building in Arlington.

42. On or about February 5, 2014, SABINO sent an e-mail to PERSON A's business partners with a contract modification (M002) for the Baghdad power plant project, which added approximately $14,674,264.60 to the contract award.

43. On or about March 5, 2014, SABINO signed a full notice to proceed with the Baghdad power plant project.

44. On or about March 14, 2014, SABINO signed a contract modification (M001), which added approximately $74,966 to the Adana HATS project.

45. On or about March 31, 2014, while PERSON A was outside the United States and SABINO was traveling from Salt Lake City to Washington, D.C. (with a layover in Chicago), SABINO withdrew approximately $500 from PERSON A's second BOA account at an ATM machine located in O'Hare International Airport in Chicago.

46. On or about April 4, 2014, SABINO signed a contract modification (M002), which added approximately $2,960,000 to the Adana HATS project.

47. On or about April 11, 2014, PERSON A and COMPANY A transferred approximately $20,000 from a foreign bank account to PERSON A's second BOA account.

48.     Between on or about April 12, 2014 and on or about June 26, 2014, while PERSON A was outside the United States, SABINO withdrew approximately $19,000 from PERSON A's second BOA account through a series of $700 and $800 ATM transactions (and one $500 transaction) at BOA branches located near SABINO's residence in Maryland and in the lobby of a DOS building near SABINO's office building in Arlington.

49.     On or about June 26, 2014, PERSON A and COMPANY A transferred approximately $40,000 from a foreign bank account to PERSON A's second BOA account.

50.     Between on or about June 27, 2014 and on or about October 15, 2014, while PERSON A was outside the United States, SABINO withdrew $40,000 from PERSON A's second BOA account through a series of $800 ATM transactions at BOA branches located near SABINO's residence in Maryland and in the lobby of a DOS building near SABINO's office building in Arlington.

51.     On or about October 15, 2014, PERSON A and COMPANY A transferred $40,000 from a foreign bank account to PERSON A's second BOA account.

52.     Between on or about October 16, 2014 and on or about December 12, 2014, while PERSON A was outside the United States, SABINO withdrew approximately $23,200 from PERSON A's second BOA account through a series of $800 ATM transactions at BOA branches located near SABINO's residence in Maryland and in the lobby of a DOS building near SABINO's office building in Arlington.

53.     On or about November 18, 2014, after PERSON A had flown to the Eastern District of Virginia and transferred $100,000 to the first BOA account, PERSON A withdrew $10,000 in cash.

54.     On or about November 22, 2014, after PERSON A and SABINO had communicated by telephone two days earlier, SABINO made $5,500 in cash deposits.

55.     On or about December 3, 2014, SABINO signed a contract modification (M004), which added approximately $1,117,702.13 to the Baghdad power plant project.

56.     On or about December 12, 2014, PERSON A and COMPANY A transferred approximately $45,000 from a foreign bank account to the second BOA account.

57.     Between on or about December 13, 2014 and on or about January 26, 2015, while PERSON A was outside the United States, SABINO withdrew approximately $18,400 from PERSON A's second BOA account through a series of $800 ATM transactions at BOA branches located near SABINO's residence in Maryland and in the lobby of a DOS building near SABINO's office building in Arlington.

58.     On or about January 26, 2015, PERSON A and COMPANY A transferred approximately $100,000 from a foreign bank account to the second BOA account.

59.     Between on or about January 26, 2015 and on or about June 11, 2015, while PERSON A was outside the United States, SABINO withdrew approximately $94,700 from PERSON A's second BOA account through a series of $800 and $200 ATM transactions (and one $100 transaction) at BOA branches located near SABINO's residence in Maryland and in the lobby of a DOS building near SABINO's office building in Arlington.

60.     On or about March 10, 2015, SABINO signed a contract modification (M005), which added $1,842,948.09 to the Baghdad power plant project.

61.     On or about March 11, 2015, SABINO withdrew $1,000 from the second BOA account by using a BOA ATM located in Waldorf, Maryland to make two transactions for $800 and $200.

-12-

62.     On or about April 28, 2015, SABINO signed two contract modifications (M007 and M008), which added $5,640,000 and $7,939,164.80, respectively, to the Baghdad power plant project.

63.     On or about April 28, 2015, after PERSON A had undergone and failed a security clearance investigation for the Baghdad power plant project, PERSON A requested an in-person meeting with SABINO and others at AQM.

64.     On or about May 5, 2015, SABINO and PERSON A communicated by telephone.

65.     Between on or about May 5, 2015 and on or about May 8, 2015, after PERSON A had traveled to the Eastern District of Virginia, PERSON A withdrew approximately $50,000 in cash from the first BOA account, and withdrew $30,000 in cash from the second BOA account.

66.     Between on or about May 9, 2015 and on or about June 19, 2015, SABINO made approximately $27,500 in cash deposits.

67.     On or about June 11, 2015, PERSON A and COMPANY A transferred approximately $50,000 (minus wire transfer fees) from a foreign bank account to the second BOA account.

68.     Between on or about June 12, 2015 and on or about July 22, 2015, while PERSON A was outside the United States, SABINO withdrew approximately $25,000 from PERSON A's second BOA account through a series of $800 and $200 ATM transactions (and two transactions of $600 and $400) at BOA branches located near SABINO's residence in Maryland and in the lobby of a DOS building near SABINO's office building in Arlington.

69.     On or about July 22, 2015, when SABINO learned that DOS investigators were scheduled to interview PERSON A regarding PERSON A's security clearance problem, SABINO stopped making ATM withdrawals from the second BOA account.

70.     Between on or about August 5, 2015 and on or about August 6, 2015, after PERSON A had flown to the Eastern District of Virginia, PERSON A withdrew approximately $30,000 in cash from the first BOA account and approximately $10,000 in cash from the second BOA account.

71.     On or about August 6, 2015, SABINO made cash deposits totaling approximately $15,000.

72.     Between on or about August 15, 2015 and on or about September 29, 2015, SABINO made cash deposits totaling approximately $36,000.

73.     On or about September 28, 2015, SABINO and PERSON A communicated by telephone shortly after SABINO received internal input on a letter informing PERSON A's business partners that PERSON A's security clearance for the Baghdad power plant project would not be reinstated.

74.     On or about September 29, 2015, PERSON A closed the BOA accounts.

75.     Between on or about November 30, 2015 and on or about September 12, 2016, SABINO made a series of cash deposits, totaling approximately $95,381.

76.     On or about May 27, 2016, SABINO signed a contract modification (M015), which added approximately $557,948 to the Baghdad power plant project.

77.     On or about August 2, 2016, SABINO signed a contract modification (M016), which added approximately $3,800,361.06 to the Baghdad power plant project.

78.     On or about August 5, 2016, SABINO signed a contract (task order) awarding approximately $4,885,900 to Company B to design-build the Marine Security Guard Residence at the U.S. Consulate in Basrah, Iraq.

79.     On or about August 18, 2016, SABINO signed a contract modification (M001), which added approximately $1,335,448.07 to the Erbil marine barracks project.

80.     On or about October 15, 2016, SABINO made a series of cash deposits, totaling approximately $13,600.

81.     On or about December 29, 2016, SABINO made a $5,000 cash deposit.

82.     On or about January 18, 2017, SABINO signed a notice to proceed on the Baghdad power plant project, and he signed a contract modification (M002), which added approximately $240,000 to the Erbil marine barracks project.

(In violation of 18 U.S.C. § 371)

## COUNT 2
**(Bribery)**

83.     The allegations set forth in paragraphs 1-9 and 13-82 are realleged and incorporated by reference as though fully set forth herein.

84.     From in or about April 2014 until on or about July 22, 2015, in the Eastern District of Virginia and elsewhere, the defendant, ZALDY N. SABINO, being a public official, directly and indirectly, knowingly and corruptly did demand, seek, receive, and accept, and agree to receive and accept anything of value personally—specifically a stream of cash payments from PERSON A—in return for SABINO being influenced in the performance of official acts, specifically a series of official acts relating to AQM and OBO procurements and contracts for the purpose of benefitting PERSON A and his business interests.

(In violation of 18 U.S.C. §§ 201(b)(2))

## COUNTS 3-14
### (Honest Services Wire Fraud)

85.     From in or about April 2014 until on or about July 22, 2015, in the Eastern District of Virginia and elsewhere, the defendant, ZALDY N. SABINO, PERSON A, and others known and unknown to the grand jury, knowingly devised and intended to devise a scheme and artifice to defraud the DOS and the citizens of the United States by depriving them of their intangible right to the honest services of SABINO, a DOS contracting officer and contract specialist, through bribery.

### Scheme and Artifice to Defraud

86.     The scheme and artifice to defraud is more fully described in paragraphs 1 through 9 and 13 through 82 of Count 1 of this Indictment, and those paragraphs are realleged and incorporated by reference in Counts 3 through 14 of this Indictment as if fully set forth.

### Execution of the Scheme and Artifice to Defraud

87.     On or about the dates shown in the chart below, in the Eastern District of Virginia and elsewhere, SABINO, for the purpose of executing and attempting to execute the foregoing scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, the signals, sounds, and writings described below, each such transmission constituting a separate count—that is, SABINO transmitted electronic mail messages through interstate and foreign wire communications from AQM in Arlington, Virginia, within the Eastern District of Virginia, to computer servers and local user devices associated with PERSON A and COMPANY A's business partners, Companies B and C, in Maryland.

| COUNT | CONTRACT | DATE | DESCRIPTION |
|-------|----------|------|-------------|
| 3 | SAQMMA12C0283 | 12/03/2014 | E-mail from SABINO's government e-mail account in the Eastern District of Virginia to PERSON A's business partners in Maryland attaching a contract modification (M004), which added $1,117,702.13 to the award amount. |
| 4 | SAQMMA12C0283 | 03/12/2015 | E-mail from SABINO's government e-mail account in the Eastern District of Virginia to PERSON A's business partners in Maryland attaching contract modification (M005), which added $1,842,948.09 to the award amount. |
| 5 | SAQMMA12C0283 | 04/28/2015 | E-mail from SABINO's government e-mail account in the Eastern District of Virginia to PERSON A's business partners in Maryland attaching contract modification (M007), which added $5,640,000 to the award amount. |
| 6 | SAQMMA12C0283 | 04/28/2015 | E-mail from SABINO's government e-mail account in the Eastern District of Virginia to PERSON A's business partners in Maryland attaching contract modification (M008), which added $7,939,164.80 to the award amount. |

88. On or about the dates shown in the chart below, in the Eastern District of Virginia and elsewhere, SABINO, for the purpose of executing and attempting to execute the foregoing scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, the signals, sounds, and writings described below, each such transmission constituting a separate count—that is, SABINO received, reviewed, certified, and approved and caused others to receive, review, certify, and approve, invoices submitted by PERSON A's business partners, Companies B and C, which caused DOS employees to transmit information contained in the invoices through interstate wire communications from Arlington, Virginia, within the Eastern District of Virginia, to Charleston,

South Carolina, so that the United States would pay PERSON A's business partners for the amounts stated in the invoices.

| COUNT | CONTRACT | VENDOR INVOICE DATE | INVOICE AMOUNT |
|---|---|---|---|
| 7 | SAQMMA12C0283 | 09/30/2014 | $4,820,799.55 |
| 8 | SAQMMA12C0283 | 12/09/2014 | $9,948,986.37 |
| 9 | SAQMMA12C0283 | 01/14/2015 | $15,843,376.32 |
| 10 | SAQMMA12C0283 | 05/11/2015 | $7,104,405.11 |
| 11 | SAQMMA13F2084 | 04/15/2014 (invoice log date) | $3,038,301.75 |
| 12 | SAQMMA13F2084 | 05/19/2014 | $513,190.75 |
| 13 | SAQMMA13F3888 | 01/31/2015 | $513,500.00 |
| 14 | SAQMMA13F3888 | 02/28/2015 | $476,147.00 |

(In violation of 18 U.S.C. §§ 1343 and 1346)

## COUNTS 15-16
### (Making False Statements and Representations)

89.    The allegations set forth in paragraphs 1-9 and 13-82 are realleged and incorporated by reference as though fully set forth herein.

90.    DOS employees with fiduciary and management responsibilities were required to file confidential, annual financial disclosure forms relating to, among other things, non-investment income, assets, gifts, and arrangements and agreements. The disclosures were made on an Office of Government Ethics Form 450 ("OGE Form 450"). The OGE Form 450 was used by executive branch employees who were less senior than public filers to report their financial interests as well as other interests outside the government. The purpose of this report was to assist employees and their agencies in avoiding conflicts (real or apparent) between official duties and private financial interests or affiliations. An employee who was required to complete the OGE Form 450 received a warning that falsification of information or failure to file or report information required to be reported may subject the filer to criminal prosecution.

91.    For the reporting years 2012 through 2017, SABINO electronically signed, certified, and filed annual OGE Form 450s in which he did not disclose any reportable income, assets, gifts, and arrangements and agreements.

92.    On or about the dates listed below, in the Eastern District of Virginia and elsewhere, the defendant, ZALDY N. SABINO, did willfully and knowingly make and caused to be made material false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, namely, the DOS:

-20-

| COUNT | DATE | DESCRIPTION AND FALSE STATEMENT |
|-------|------|--------------------------------|
| 15 | 02/13/2015 | SABINO electronically signed and submitted an OGE Form 450 to the DOS and stated therein that in 2014, he had no reportable outside income, gifts, assets, and arrangements and agreements when, as SABINO well knew, he was receiving cash payments from PERSON A. |
| 16 | 01/15/2016 | SABINO electronically signed and submitted an OGE Form 450 to the DOS and stated therein that in 2015, he had no reportable outside income, gifts, assets, and arrangements and agreements when, as SABINO well knew, he was receiving cash payments from PERSON A. |

(In violation of 18 U.S.C. §§ 1001(a)(2) and 2)

## COUNT 17
### (Making False Statements and Representations)

93.     The allegations set forth in paragraphs 1-9 and 13-82 are realleged and incorporated by reference as though fully set forth herein.

94.     As a DOS Contract Specialist and Contracting Officer, SABINO held a Top Secret security clearance to perform his official duties and responsibilities. To obtain and maintain a Top Secret security clearance, DOS employees were required to complete a background investigation when they were hired and, every five years thereafter, were required to undergo a periodic reinvestigation. Among other things, the background investigations and periodic reinvestigations included the following: (a) the completion of a Standard Form 86, Questionnaire for National Security Positions ("SF-86"); and (b) participation in a personal subject interview (conducted by an investigator). SABINO underwent a periodic background reinvestigation in or about 2015, which included a personal subject interview.

95.     DOS employees undergoing background investigations and periodic reinvestigations for national security positions were required to affirm that they had provided truthful and accurate information. DOS employees were also warned and advised that providing false or misleading information during a background investigation could result in criminal prosecution and, among other things, could have a negative effect on their security clearance, employment prospects, or job status, up to and including denial or revocation of their security clearance, or their removal and debarment from Federal service.

96.     On or about November 5, 2015, the defendant, ZALDY N. SABINO, did willfully and knowingly make and caused to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of Government of the United States, namely, the DOS; that is, SABINO, during an interview in Arlington, Virginia,

-22-

in the Eastern District of Virginia, falsely stated to an investigator for the DOS's Bureau of Diplomatic Security that SABINO: (a) did not have any unexplained sources of income; (b) had not engaged in any deceptive, illegal, or irresponsible financial practices; (c) had not been involved in any crime, and had not associated with anyone involved in illegal activities to his knowledge; (d) had not deliberately omitted, concealed, or falsified relevant and material facts from any personnel security questionnaire, personal history statement, or similar form used to conduct investigations, determine employment qualifications, award benefits or status, determine security clearance eligibility or trustworthiness or award fiduciary responsibilities; (e) had not deliberately provided false or misleading information concerning relevant and material matters to an investigator in connection with a personnel security or trustworthiness determination; (f) had not engaged in personal conduct or concealment of information that may increase vulnerability to coercion, exploitation or duress such as engaging in activities which, if known, may affect his personal, profession, or community standing or render him to be susceptible to blackmail; and (g) has not had association with any person, group or business venture that could be used, even unfairly, to criticize, impugn, or attack his character or qualifications for a government position. These statements and representations were false because, as SABINO then and there knew, he was receiving cash payments from PERSON A in exchange for preferential treatment concerning DOS contracts awarded to PERSON A's companies and business partners.

(In violation of 18 U.S.C. §§ 1001(a)(2) and 2)

## **FORFEITURE NOTICE**

THE GRAND JURY FINDS PROBABLE CAUSE FOR FORFEITURE AS SET FORTH
BELOW:

97.     Pursuant to Rule 32.2(a), the defendant, ZALDY N. SABINO, is hereby notified
that, if convicted of the bribery offense alleged in Count 2 of this Indictment, any of the honest
services wire fraud offenses alleged in Counts 3-14 of this Indictment, or a conspiracy to commit
bribery and honest services wire fraud, as set forth in Count 1 of this Indictment, he shall forfeit
to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c),
any property, real or personal, which constitutes or is derived from proceeds traceable to the
offense(s). The property to be forfeited includes, but is not limited to, the following: real
property located in Fort Washington, Maryland and a money judgment order of at least
$230,000.

98.     If any of the property directly traceable to the offense(s), as a result of any act or
omission of the defendant:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be divided
            without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21
U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

(In accordance with 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); and Rule 32.2(a), Federal
Rules of Criminal Procedure.)

A TRUE BILL: Pursuant to the E Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____

Foreperson

G. Zachary Terwilliger
United States Attorney

By:   _____
Jack Hanly
Assistant United States Attorney
Edward P. Sullivan
Special Assistant United States Attorney (LT)
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3700
Fax: (703) 299-3981
Jack.Hanly@usdoj.gov
Edward.P.Sullivan@usdoj.gov